UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| CORNELIUS WILLIAMS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 7:13-cv-02139-AKK-JHE |
| | ) | |
| TAWAYNE L. WHITT, et al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff Cornelius Williams, Jr., an inmate incarcerated at Bibb County Correctional Facility in Brent, Alabama, filed this *pro se* action pursuant to 42 U.S.C. § 1983. (Doc. 1). He names as defendants Corrections Officers Tawayne L. Whitt, Dexter Nixon, and Orlando Walker, and alleges they subjected him to excessive force. (*Id.*). The plaintiff seeks monetary damages and has demanded a jury trial.[1] (*Id.* at 1, 4). In accordance with the usual practices of this Court and 28 U.S.C. § 636(b)(2), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

---

[1] The plaintiff recently filed a motion for a jury trial. (Doc. 33). To the extent he demanded a jury trial in his complaint and this action survives the defendants' motion for summary judgment, the motion for jury trial is due to be granted to the extent that the case will be heard by a jury when it proceeds to that point. A jury trial date will not be set at this time, as that is premature.

1

I.         **Procedural History**

On January 17, 2014, the court entered an Order for Special Report directing that copies of the complaint be forwarded to each of the named defendants and that the defendants file a special report addressing the factual allegations contained therein. (Doc. 11). The order advised the defendants that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would considered it a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*Id.*). The order advised the plaintiff that, after he received a copy of the special report, he would have twenty days to file counter affidavits if he wished to rebut the matters presented in the special report. (*Id.*).

On April 23, 2014, the plaintiff filed initial disclosures. (Docs. 26, 27-1). On April 25, 2014, the defendants filed a special report. (Doc. 28). Thereafter, the court notified the plaintiff he would have twenty days to respond to the motion for summary judgment, including filing affidavits or other material if he chose. (Doc. 29). The court also advised him of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. (*Id.*). *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). On May 19, 2014, the plaintiff filed a response. (Doc. 32).

II.         **Standard of Review**

Because the court has construed the defendants' special report as a motion for summary judgment, it must determine whether the defendants are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.* In making this assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477

U.S. 317 (1986). The moving party has the burden of proof to establish its entitlement to summary judgment by showing the absence of genuine issues and that it is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc*., 929 F.2d 604 (11th Cir. 1991).

Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

### III.    Summary Judgment Facts

The plaintiff alleges the defendants subjected him to excessive force on June 19, 2013, and then "placed [him] inside a solitary confinement unit" for "ninety (90) days." (Doc. 1-1 at 2). The plaintiff further alleges that, since the assault, he has suffered from "severe pains such as headaches" and has "been diagnosed with an optham[ic]-related injury, which has been adversely affecting his left eye and vision." (*Id.*).

#### A.    The Alleged Assault

The plaintiff alleges he was approached by Officer Tawayne L. Whitt on June 19, 2013, and, "[w]ithout provocation or reason," Whitt pepper sprayed him and then took a nightstick and repeatedly struck him with it. (Doc. 1-1 at 2).[2] Whitt did not radio for assistance during the

---

[2] Whitt denies he "approached [the plaintiff] without reason, pepper sprayed him and repeatedly struck him with my nightstick." (Doc. 28-6, Exhibit C at 1).

assault, and the plaintiff contends this was because he was "not fighting back . . . resisting, or attempting to leave the scene." (*Id.*). The plaintiff refers to the "Use of Force Inmate Written Statement," he submitted under oath immediately after the June 19, 2013 incident to explain the details. (Doc. 32 at 5) (citing doc. 28-1, Exhibit A at 11).[3] In that statement, he attests

> I had just come out of my dorm which is C-4, and I was standing in between A-Dorm and B-Dorm when Officer Whitt came out and stop[ped] in front of me and ask[ed] what I was listen[ing] to. I told him nothing[, and] that['s] when he told me to catch the wall. I ask[ed] him why and he got angry and [opened] up his mace on me. I ask[ed] . . . why he [was] doing that he told me to shut the f—k up and do as he say[s]. I went to show him what I had in my pocket and he sprayed me in the face. When I tri[ed] to block the spray he pull[ed] his stick and started to beat me down so I tri[ed] to protect myself. All I had in my pocket is a pack of open tops and my radio. I need to see the Warden!

(*Id.*).[4]

---

[3] The court will cite to the document and page numbers assigned by the court's electronic filing system, CM-ECF, except for the exhibits attached to the defendants' motion for summary judgment. Citation to those exhibits refer to the CM-ECF docket number, but the exhibit titles and page numbers are those assigned by defense counsel. The court adopts this method in connection with the defendants' exhibits because the plaintiff cites portions of those exhibits in his responsive pleadings, and in so doing, follows the defendants' organization.

[4] Whitt denies the plaintiff's allegations, and attests that he was exiting B-Dorm on the day of the incident when he

> observed Inmate [Williams], standing on the sidewalk between A and B dorm. Inmate Williams had some black ear buds in his ear. I approached Inmate Williams as to what he was listening to. Inmate Williams stated, 'I ain't got nothing.' I then ordered Inmate Williams to walk to A Dorm and place his hands on the wall to be searched. Inmate Williams refused and stared at me. I then noticed Inmate Williams with his hands in his pocket. I gave Inmate Williams another order to submit to a search or just give me the contraband. Inmate Williams pulled an unidentified object out of his pocket and threw it while advancing toward me. I pulled my Sabre Red and sprayed (1) burst to Inmate Williams['s] facial area. Inmate Williams continued charging me stating, 'Oh you gonna spray me,' as I gave several direct orders to cease his action and get down on the ground. Inmate Williams continued to be combative by throwing several punches at which time I stepped back and pulled my baton and gave (1) forward strike. Sergeant Christopher Webster observed Inmate Williams throwing punches at me and called Code Red via hand held radio. Several

While lying on the ground after being beaten by Officer Whitt, Officers Nixon and Walker "came on the scene." (Doc. 1 at 3). Both proceeded to pepper spray the plaintiff again and beat him "with nightsticks upside [his] head[,] busting a gash in [it.]" (*Id.*).[5] "[O]ne of the officers hollered that[']s enough stop, but before the officers stopped beating [him] with their nightsticks[,]" the plaintiff's head was "busted open[,]" [his] left eye [was] swollen[,]" and he had "other bruises over [his] body[.]" (*Id.* at 3-4). At no time did the plaintiff ever pose a threat to the officers, fight back, resist restraint or attempt to flee. (*Id.* at 4).

When the plaintiff was taken to the infirmary for decontamination and treatment, Nurse Sanders noted, and the plaintiff does not dispute, that he was "using profanity and threatening Captain Butler and DOC staff . . . . [by] repeatedly stat[ing], 'You don't know me for real, [I']m a gangster and I'm glad I know how to fight. It took 5 police to get me and ya'll [sic] had those police." (Doc. 28-1, Exhibit A at 7). He also does not dispute that immediately after he was released from the infirmary, Captain Roesha Butler questioned him about the incident, and he responded by "stating, 'I'm gonna make ya'll [sic] crank that van up, I want to talk to the Motherf—king Warden.'" (*Id.* at 2).

The plaintiff was placed in segregation and charged with three disciplinary infractions as

---

security officials responded to the scene. Sergeant Webster placed handcuff restraints on Inmate Williams double locked to the rear, all force ceased. Sergeant Webster and Sergeant Jerome Smith escorted Inmate Williams to the infirmary to be decontaminated and examined. Inmate Williams sustained a laceration to the left side of his head.

(Doc. 28-6, Exhibit C at 1-2). Neither Sergeant Webster nor Jerome Smith submitted an affidavit.

[5] Nixon submitted no affidavit. Orlanda Walker denies the plaintiff's excessive force allegations." (Doc. 28, Exhibit B at 1). He attests that he "did respond to a code red regarding Officer Tawayne Whitt and inmate Williams but at no time did I spray or beat Williams with my night stick." (*Id.*).

5

result of the June 19, 2013 incident. (Doc. 28-1, Exhibit A at 12-13; doc. 28-3, Exhibit A at 17-21; doc. 28-4, Exhibit A at 19-31). He pled guilty to insubordination for making the comment to Captain Butler, and received thirty days segregation and loss of outside, canteen, and telephone privileges. (Doc. 28-4, Exhibit A at 29-30). A charge for assaulting Officer Whitt was dismissed nolle prosequi because the disciplinary hearing "was not held within the targeted . . . date." (*Id.* at 26-27).

The third disciplinary infraction was for failure to obey Officer Whitt's orders. (Doc. 28-4, Exhibit A at 18-19). At the June 26, 2013, disciplinary hearing on this infraction, the plaintiff submitted the following statement under oath:

> Officer Tawayne Whitt aledges [sic] that I refused to comply with his direct orders. I refute th[ese] accusations, because in no way did I fail to cooperate with his direct orders as they were stated to me. When Officer Whitt first approached me while I was between dorms A and B, he instructed me to stop. He then ask[e]d me what I was listening to! I replied to him that I was listening to my radio. After I gave him my reply the exact words he used to convey his next instructions to me were "Let me see what is in your pockets then." Then I did produce the full contents of my pockets for his visual inspection as per his orders. At that time nor at any other time did Officer Whitt instruct me to turn over to him the contents of my pockets, "which was a Jennsen radio and a pack of Tops." He did not order me to allow him to conduct a more thorough search of my person nor the contents of my pockets. He did not order me to accompany him anywhere so that he could conduct a strip search on me. In short, he did not give me any "follow up orders." Therefore, this disciplinary should be thrown out. Because I did in fact fully comply with his direct orders as he stated them to me. Nor did I offer any resistance by not allowing Officer Whitt to carry out any of his duties as a correctional officer. I did not refuse to obey any subsequent orders issued by Officer Whitt, because these subsequent orders were never stated to me to my hearing.

(*Id.* at 24-25). The hearing officer found the plaintiff guilty of the infraction, and he was punished with thirty days disciplinary segregation and loss of canteen, store, and visiting privileges. (*Id.* at 19).

Inmates Derava Riggs, Lloyd B. Phelps, Jere Caddell, Jeremie Williams, and Trizan

Smith witnessed the incident or portions of it and provided written statements. (Doc. 32-1, Exhibits A-E). Only two of these witnesses, Jeremie Williams and Trizan Smith, testified at the plaintiff's disciplinary hearing for failure to obey a direct order. *See supra*.

> According to Derava Riggs
>
> Whit[t] asked Inmate Williams what he was listening to, and I observed Inmate Williams take from his left pocket a[n] AM/FM store bought radio, and a pack of top tobbaco [sic]. Whit[t] then told me and another inmate to walk towards a dorm entrance. We did what we we[re] told. As we walked towards the entrance Officer Whit[t] pulled out a can of mace and sprayed inmate Williams in his face. Inmate Williams began to yell and tried to cover his face, when Officer Whit[t] pulled out his [b]aton and knocked the radio and tobacco [sic] from Inmate Williams[']s] hand to the ground.
>
> Officer Whit[t] began to strike Inmate Williams repeatedly in the head with his stick while the inmate was trying his best to cover himself from being hit. When Inmate Williams fell to the ground he balled up in a fetal like position to try to avoid further strikes[. O]ther officers began to run towards the incident, and they began to assault inmate Williams while he was on the ground. One officer cuffed Inmate Williams and when the cuffs we[re] on him Officer Whit[t] continued to hit him alon[g] with Officer Walker and Officer Nixon. They then made everyone clear the yard so nothing further could be seen.

(*Id.,* Exhibit A at 1).

Inmate Lloyd B. Phelps also noticed the plaintiff talking with Officer Whitt and observed him pull a radio out of his pocket. (*Id.*, Exhibit B at 3). He does not allege he heard the conversation between the plaintiff and Whitt. He saw Whitt pepper spray the plaintiff and hit the plaintiff in the forehead with his nightstick. (*Id.*). He does not state that the plaintiff yelled and tried to cover his face.

Phelps does attest the plaintiff "laid down on the ground" after Whitt hit him in the forehead. (*Id.*). Phelps does not state that Whitt ever hit the plaintiff again. However, he does attest that while the plaintiff was laying on the floor, "3 or 4 more officers [came and began] kicking & swinging the[ir] billy clubs[.]" (*Id.*). Phelps attests the plaintiff "was hit several times

in the back of his head, two, or three, times in the left forearm, and left hand. This was uncalled for[.]" (*Id.*).[6]

Inmate Jere Caddell saw Officer Whitt stop the plaintiff and appear to question him, but does not state he heard the conversation. (*Id.*, Exhibit C at 5). The plaintiff "pull[ed] a clear radio and a pack of top-cigarettes from his pocket" and displayed them to Officer Whitt. (*Id.*). In response, Whitt pepper sprayed the plaintiff and hit him in the head with a nightstick. (*Id.*). Caddell does not state that he heard the plaintiff yell when sprayed and attempt to cover his head with his hands.

Like inmate Phelps, Caddell states that after Whitt hit him (the plaintiff) in the forehead, he (the plaintiff) immediately lay down and "tried to cover up," but, unlike Phelps, Caddell alleges Whitt continued to hit the plaintiff while he was on the ground. (*Id.*). "A few minutes later[,]" Caddell saw Sergeant Webster and Officers Nixon, Bates, Beasley, Walker running "to the incident." (*Id*. at 6). Officers Nixon and Walker joined Officer Whitt in hitting the plaintiff as if "they were trying to beat [him] unconscious." (*Id.*).

Caddell states that "[a]t no time" did Sgt. Webster or Officer Bates attempt to stop the beating. (*Id*.) Only after Caddell "yelled out 'that's enough you all got him on the ground and he's a thre[a]t to no one,'" did the officers stop. (*Id.*). Caddell asserts "[t]here was no reason for Officer Whitt to pull his spray and nightstick, nor to use them on Williams, because Williams made no action at Officer Whitt, nor [anyone] in the area for that matter, that could reasonably imply or indicate the threat of harm to Officer Whitt, or anyone else." (*Id.*). He also declares that officers at BCCF "have a long history of assaulting inmates without reason [o]r

---

[6] Phelps declares the plaintiff "has damage to his left eye, due to the blow on his forehead[,]" but this is his personal opinion, and he is not a medical professional. (*Id.*).

8

justification[,]" and the administration has an equally long history "of covering [it] up." (*Id.*).

Inmate Jeremie Williams saw "Officer Whitt walk[] up and ask[] Inmate Williams what he was listening to and he said his radio. Officer Whitt then told him to catch the wall and he wouldn't."[7] Thereafter, Williams testifies similarly to Caddell, that the plaintiff first fell to the ground. (*Id.*, Exhibit D at 8). He states the plaintiff was yelling and trying to protect himself as he fell, but defendant Whitt kept beating him "with the nightstick." (*Id.* at 8-9). When defendants Nixon and Walker "responded to the incident," they did not "attempt to stop" Whitt, but instead "pulled their nightsticks and beg[an] beating Williams." (*Id.* at 9). He asserts the plaintiff never took action toward Whitt or to harm anyone. (*Id.*). He also attests that "Whitt, Nixon and Walter have a history of ass[a]ulting inmates for no reason[, and] the administration at [BCCF] have a history of covering up the conduct of the[] correctional officers." (*Id.* at 9).

Inmate Trizan Smith attests that he "was walking with [the plaintiff] when" Whitt stopped them. (Doc. 27-1, Exhibit E at 10). When Whitt began to question the plaintiff, Smith walked off. (Doc. 28-4, Exhibit A at 5).[8] Smith heard Whitt ask the plaintiff what he was listening to, to which the plaintiff responded that it was his radio. (Doc. 27-1, Exhibit E at 10). When asked if the plaintiff had showed all of the contents in his pockets at Whitt's behest, Smith answered that he did not know what the plaintiff had in his pockets. (Doc. 28-4, Exhibit A at 5). A few minutes later several officers ran by him, and Smith "turned [his] attention back to where Officer Whitt had been questioning Williams." (Doc. 27-1, Exhibit E at 10). Smith saw the

---

[7] Taken from Williams's testimony under oath at a June 26, 2013, disciplinary proceeding against the plaintiff instituted by Officer Whitt for failing "to obey a direct order" ("submit to a search") on the day of the incident. (Doc. 28-4, Exhibit A at 19).

[8] Taken from Smith's testimony under oath at the plaintiff's June 26, 2013 disciplinary hearing for failure to obey a direct order.

plaintiff "face down on the ground" as Whitt hit him with a nightstick. (*Id.*). Officers Walker and Nixon also attacked the plaintiff as Sgt. Webster and Officer Bates looked on and did nothing to help the plaintiff. (*Id.* at 10-11).

### B. The Extent of Plaintiff's Injury

After he was beaten, the plaintiff was "escorted to the infirmary by Sergeant Chris Webster[,]" where "the medical staff" flushed the plaintiff's eyes and examined his injuries. (Doc. 1-1 at 2). Nurse Sanders made notes of her assessment, which read:

> "I'm still burning." Alert & oriented x 3. Verbally responsive. Breathing with ease & unlabored. Lungs CTA. Skin warm & dry to touch. Swollen module to center of forehead. 2[.5] cm laceration top of left scalp. Bowel sounds present x 4 quads. Gait steady. Moves all extremities with ease. No s/s of acute distress. Altered Skin Integrity. Referred to M.D. for evaluation. Glue applied to scalp laceration.

(Doc. 28-1, Exhibit A at 4). The plaintiff was prescribed Keflex and Naprosyn twice per day for five days. (Doc. 28-7, Exhibit D at 18; Doc. 28-9, Exhibit D at 47).

After he was released back to the ADOC, the plaintiff's written statement and photographs, (doc. 28-2 & 28-3, Exhibit A at 14-17), were taken. The eight color photographs are not perfectly clear, but they depict the plaintiff's face, head, arms, hands and bare torso from the front, both sides, and back. (Doc. 28-2 & 28-3, Exhibit A at 14-17). The photographs show a gash on his left scalp and a knot on his forehead. (*Id.* at 14).

After his statement and photographs were taken, the plaintiff was placed in segregation. (Doc. 28-1, Exhibit A at 12). Beginning June 20, 2013, the plaintiff was checked daily by medical personnel in the segregation dorm. (Doc. 28-7, Exhibit D at 13). On June 23, 2013, he complained of bad problems with and draining from his left eye. (Doc. 28-7, Exhibit D at 31). The next day, a nurse wrote that the plaintiff was complaining he had had a "sharp pain in eye,

hurting bad since Wednesday. Eye draining Wednesday, Thursday, Friday and has been burning and hurting every [sic] since and have blurred vision." (*Id.* at 30). She observed that the eye was painful, "with redness to [the] schlera," and referred the plaintiff to Dr. Whitley for the "next eye appt." (*Id*. at 16, 30). The plaintiff was prescribed liquid tears, to be administered four times a day for seven days. (Doc. 28-9, Exhibit D at 45). On the same date, the plaintiff's Keflex prescription was renewed for seven days, and he was prescribed Tylenol 650 mg twice a day for five days. (*Id.*).

On July 18, 2013, the plaintiff was diagnosed with a resolving corneal ulcer to his left eye, and was prescribed a Tobradex suspension three times per day for seven days. (Doc. 28-7, Exhibit D at 16). On July 27, 2013, the plaintiff complained of "real bad headaches and pains in the side of [his] head." (*Id.* at 27). On July 29, 2013, the plaintiff was examined. (*Id.* at 28). He reported "chronic headaches" that resulted from head traumas occurring in April and June 2013. (*Id.*). He also reported slight numbness to left side of his neck a day earlier that had dissipated. (*Id.*). He was prescribed Motrin 200 mg, to be taken as needed. (*Id.* at 29).

On August 12, 2013, the plaintiff saw an optometrist. (Doc. 28-9, Exhibit D at 49). According to the optometrist's notes, the plaintiff "had been hit in the head and sprayed with mace. Scuffle on the ground." (*Id.*). This event had occurred two weeks earlier and he had blurry vision and pain. (*Id.*). The plaintiff reported being "[b]etter now but still [illegible]." (*Id.*). The plaintiff's eyesight was 20/50 on the right and 20/40 on the left without glasses. (*Id.*). His eyes were dilated, and there are no findings reported. (*Id.*). The optometrist noted a "resolving ulcer." (*Id.*). The plaintiff was given a glasses prescription which afforded him 20/20 vision in both eyes. (*Id.*). On the same day, the plaintiff's Tobradex prescription was renewed, and he received a prescription for Ibuprofen, acetaminophen, and a multivitamin to keep on his

11

person.  (Doc. 28-7, Exhibit D at 16; Doc. 28-8, Exhibit D at 38).

On August 18, 2013, the plaintiff reported his left eye and the left side of his forehead were hurting.  (Doc. 28-7, Exhibit D at 23).  He was examined the next day and stated his head had been hurting since June, when he was hit with a stick.  (*Id.*).  He also reported numbness to the left side of his head, and that closing his eyes and putting a warm towel on his head helped his symptoms.  (*Id.*).  The plaintiff was prescribed Motrin, 200 mg per day for 7 days.  (*Id*. at 25).

The plaintiff received eyeglasses on August 20, 2013.  (*Id.* at 11).  On September 9, 2013, the plaintiff complained of pain on the left side of his head since June.  (*Id.* at 19).

## IV.    Analysis

### A.    Official Capacity Claims

To the extent the plaintiff requests monetary damages for constitutional claims against the defendants in their official capacity, the defendants' motion for summary judgment is due to be granted.  The Eleventh Amendment bars § 1983 claims in federal court against the state or an agency of the state.  *Alabama v. Pugh*, 438 U.S. 781 (1978); *see also Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984).  The Supreme Court in *Pugh*, stated:

> [T]here can be no doubt . . . that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit.  *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459 (1945); *Worcester County Trust Co. v. Riley*, 302 U.S. 292 (1937).  Respondents do not contend that Alabama has consented to this suit, and it appears that no consent could be given under Art. I, sec. 14, of the Alabama Constitution, which provides that "the State of Alabama shall never be made a defendant in any court of law or equity."

438 U.S. at 782.  "Absent a legitimate abrogation of immunity by Congress or a waiver of immunity by the state being sued, the Eleventh Amendment is an absolute bar to suit by an

individual against a state or its agencies in federal court. *Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)." *Gamble v. Florida Dept. of Health & Rehabilitative Services*, 779 F.2d 1509, 1511 (11th Cir. 1986). The Eleventh Amendment therefore applies to claims for injunctive and declaratory relief as well as claims for monetary relief. *Edelman v. Jordan*, 415 U.S. at 662-71 (monetary relief); *Alabama v. Pugh*, 438 U. S. at 782 (injunctive relief).

Accordingly, without a waiver of sovereign immunity there is no genuine issue of material fact, and the motion for summary judgment is due to be granted as to the excessive force claims against the defendants in their official capacities.

**B.    Individual Capacity Claims**

    **1.    Qualified Immunity**

The defendants contend they are entitled to qualified immunity against the plaintiff's excessive force claim. (Doc. 28 at 8-9). However,

> [i]n this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in *Hudson* [*v. McMillian*, 503 U.S. 1 (1992)] and *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]. *See Johnson. v. Breeden*, 280 F.3d 1308, 1319 (11th Cir. 2002). There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation. *Id.* The only question, then, is whether the plaintiff has alleged facts sufficient to survive a motion to dismiss or motion for summary judgment. If he has done so, that is the end of the inquiry.

*Skrtich v Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002). Accordingly, because the affirmative defense of qualified immunity is not available to the defendants, this is not a proper ground for summary judgment.

    **2.    Eighth Amendment Excessive Force**

13

The Eighth Amendment prohibition against cruel and unusual punishment is triggered when a prisoner is subjected to an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. at 319. "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline[] or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. at 6-7. The Supreme Court explained:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order. Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"

*Hudson*, 503 U.S. at 9 (citations omitted).

When evaluating whether the force used was excessive, courts consider the following factors: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate. *Id*. at 7; *see Hewett v. Jarrad*, 786 F.2d 1080, 1085 (11th Cir. 1986).

Having reviewed the summary judgment facts in light of these factors, there are several disputed issues of material fact preventing the entry of summary judgment on this claim. Considering the first and second factors, the need for application of force and the relationship between that need and the amount of force used, there are questions of fact as to whether Defendant Whitt had any reason to administer pepper spray because the plaintiff obeyed his

order in a compliant, non-threatening manner and whether Defendant Whitt had any reason to hit the plaintiff in the forehead with a baton or to continue hitting him while he was on the ground. These disputed facts also go to the third factor, the nature of the threat reasonably perceived by the officer(s). There are also questions of fact as to whether Defendants Nixon and Walker hit the plaintiff with their batons while he was laying the ground causing a laceration to the left side of his head. There is little or no evidence the defendants made any effort to temper the severity of their forceful response, the fourth factor to be considered.

As a result of the assault, the plaintiff had a knot on his forehead and a laceration on the side of his head that had to be glued together. (Doc. 28-1, Exhibit A at 4). He was bruised, suffered a corneal ulcer in his left eye, and endured severe headaches. (Doc. 28-7, Exhibit D at 16-31). He remained on pain medication for three months after the incident for related symptoms. (*Id.*). When considering the extent of the plaintiff's injuries, the fifth factor, the undersigned must infer that more force was used than that which Whitt attests, creating another genuine issue of material fact.

Having considered the above-listed excessive force factors, there are several genuine issues of material fact, and the defendants have not demonstrated their entitlement to summary judgment on the plaintiff's excessive force claim against the defendants in their individual capacity.

## V. Recommendation

For the reasons stated above, the undersigned **RECOMMENDS** the defendants' motions for summary judgment, (doc. 30), be **GRANTED** as to the plaintiff's official capacity claims, be **DENIED** as to the remaining individual capacity claims, and that this action be **REFERRED** to the undersigned for further proceedings. The undersigned **FURTHER RECOMMENDS** the

plaintiff's motion for a jury trial, (doc. 33), be **GRANTED** to the extent he demanded a jury trial in his complaint and this action survives the defendants' motion for summary judgment. This case will be heard by a jury when it proceeds to that point. A jury trial date will not be set at this time, as that is premature.

## VI. Notice of Right to Object

Any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed with the clerk of the court. Any objections to the failure of the magistrate judge to address any contention raised in the petition must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the magistrate judge. *See* U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). In order to challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which specifically identify those portions of the proposed findings and recommendations to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action. Frivolous, conclusive, or general objections will not be considered by the District Court.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendations to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge. The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record. The district judge may also receive further evidence, recall witnesses, or

recommit the matter to the magistrate judge with instructions.

Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a district judge.

The Clerk is **DIRECTED** to serve a copy of this report and recommendation upon the plaintiff and upon counsel for the defendants.

DONE this 14th day of January 2015.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE